UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW LEE,<br><br>            Plaintiff,<br><br>      v.<br><br>THE PEP BOYS-MANNY MOE & JACK<br>OF CALIFORNIA, et al.,<br><br>            Defendants. | Case No.  12-cv-05064-JSC<br><br>**ORDER RE: CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 180, 181 |

        This action arises out of the attempted collection of debt incurred by Plaintiff Andrew Lee ("Plaintiff") as a result of his alleged misuse of his employee discount and for changing the oil on his car while at work at Defendant The Pep Boys Manny Moe & Jack of California ("Pep Boys"). Plaintiff alleges that the settlement demand letter that Defendants Palmer Reifler & Associates ("Palmer") and Patricia Hastings ("Hastings") sent to him violated various provisions of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.§ 1692, and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200.  Now pending before the Court are Defendants' motion for summary judgment and Plaintiff's cross-motion for partial summary judgment.  (Dkt. Nos. 180, 181.)[1]  Upon consideration of the parties' submissions, and having had the benefit of oral argument on April 14, 2016, the Court GRANTS IN PART Defendants' motion for summary judgment and GRANTS IN PART Plaintiff's motion for partial summary judgment.

## BACKGROUND

**A.      Summary Judgment Evidence**

        Pep Boys, a California corporation with retail auto stores throughout the state, employed

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Plaintiff at their Pasadena location beginning in 2004.  (Dkt. No. 180-3 at 4.)  As of 2012, Plaintiff worked as an "Express Service Technician."  (*Id.* at 18.)  On April 17, 2012, Plaintiff was terminated for allegedly performing an oil change on his own car at Pep Boys' garage and for improperly using his employee discount.  (Dkt. No. 181-2 ¶ 2.)

       1.    <u>Pep Boys' Policies</u>

       Pep Boys enacted written policies governing employees' work, including rules about employees working on their own cars while on the job and use of their employee discounts. Plaintiff saw those policies for the first time sometime in 2010—that is, prior to his termination. (Dkt. No. 180-3 at 17, 32-35.)

       With respect to employees servicing their own cars, at the time of Plaintiff's incident in 2011 Pep Boys had implemented a written policy entitled "Standard Operational Procedures" regarding the company's "Working on My Own Vehicle Program[.]"  (Dkt. No. 136-1 ¶ 5; *id.* at 7-8.)  The policy permits certain employees—specifically, "flat rate" associates working as "Master Technicians, EP Technicians, Technicians A & B, and Mechanics"—to service, maintain, and replace parts on their own cars at the Pep Boys location where they work subject to certain restrictions.  (*Id.* at 7.)  The policy also clearly states that "non-flat rate associates are not permitted this benefit, No exceptions."  (*Id.*)  Those employees eligible for the program must meet a number of requirements in order to service their own cars, including: (1) sign an agreement release and assumption of liability form each time they work on their cars; (2) have their manager sign the same forms; (3) be "off the clock" when they service their cars; (4) work in certain hours, specifically off-peak even hours on Tuesdays, Wednesdays, or Thursdays unless the Area Director provides approval otherwise; (5) obtain a work order from the service manager and obtain prior approval from the Area Director for the work done.  (*Id.*)

       As for the employee discount, a section of Pep Boys' Standard Operational Procedures entitled "Associate Discount" permitted employees to purchase most merchandise at a 20 percent discount.  (Dkt. No. 136-1 ¶ 5; *id.* at 5.)  Pep Boys had several iterations of the written policy in place.   In one document, the policy provides that the discount "is for personal use and the use of the [employee's] spouse and dependent children[.]"  (*Id.* at 5.)  Elsewhere, in an employee

handbook, the rule is written to apply only to an employee's spouse.  (*See* Dkt. No. 181-1 at 254 ("Pep Boys associate discount program is for individual personal usage by the associate and/or their spouse.").)  A separate page of an employee training manual entitled "Associate Dishonesty" clarifies that employees are "**ONLY** allowed to give some discounts to your spouse, dependent children or dependent parents" and labels providing the employee discount to friends as internal theft.  (Dkt. No. 180-3 at 32 (emphasis in original).)  Mr. MacDonald conceded that it could be confusing to an associate to have these policies with varied terms.  (Dkt. No. 181-1 at 176.)  He also told Plaintiff that ten different employees could have ten different interpretations of the policy.  (*Id.* at 175.)  Regardless, both Mr. MacDonald and Pasadena Shop Service Manager Jeff Hayden averred that Pep Boys never permitted employees to extend the merchandise discount to friends.  (Dkt. No. 136-3 ¶ 10; Dkt. No. 136-2 ¶ 6.)  At least one version of the policy explicitly stated as much.  Training on this employee discount policy is part of Pep Boys' initial employee training.  (Dkt. No. 136-2 ¶ 6.)

In any event, when Pep Boys employees give their discount to qualified individuals, the family member brings the merchandise to the cashier, identifies the employee and the employee's number, and the cashier rings up the transaction for the qualified family member.  (Dkt. No. 136-3 ¶ 12.)

2.     Plaintiff's Purported Misconduct, Investigation & Termination

On April 12, 2012, after clocking into work, Plaintiff serviced his own car using oil and an oil filter that he had purchased earlier.  (Dkt. No. 180-3 at 7, 27; Dkt. No. 181-1 at 182-183.)  Plaintiff was not eligible for the Working on My Own Vehicle Program because he was an Express Tech compensated on a piece-rate basis, not a flat-rate technician.  (Dkt. No. 181-1 at 180-81.)  Plaintiff did not seek permission from a manager either before or after he did the work.  (Dkt. No. 180-3 at 7-8.)

Plaintiff also admitted to allowing his friend Michelle Bacca to use his employee discount privilege.  (Dkt. No. 180-3 at 12; *see also* Dkt. No. 136-3 ¶ 11.)  Ms. Bacca was the customer in the transaction; Plaintiff was not present in the store at the time.  (Dkt. No. 180-3 at 11.)  Plaintiff testified that his shop service advisor, Mr. Hayden, gave him permission to have friends use the

3

United States District Court
Northern District of California

1  discount.  (Dkt. No. 136-10 at 30-32; Dkt. No. 136-11 at 18-19.)  Mr. Hayden, in contrast, averred

2  that no such conversation occurred, that he never gave Plaintiff permission to extend the discount

3  to his friend, and that he did not approve, authorize, or handle the transaction.  (Dkt. No. 136-2

4  ¶ 7.)  During Pep Boys' internal investigation of the incident, Plaintiff stated that he did not realize

5  he had violated Pep Boys' policy by letting Ms. Bacca use his discount.  (Dkt. No. 180-3 at 28;

6  Dkt. No. 181-1 at 178-179.)  Plaintiff represented that he had given his discount two or three times

7  to family and friends.  (Dkt. No. 180-3 at 28.)  He used his employee discount for the car of his

8  mother, Chung Wah Lee, and on that occasion the transaction was between Plaintiff and Pep

9  Boys, not Chung Wah Lee and Pep Boys.  (Dkt. No. 136-10 at 36-39; Dkt. No. 180-3 at 11; *see*

10  *also* Dkt. No. 181-2 ¶ 2.)

11        Mr. MacDonald conducted an internal investigation on Pep Boys' behalf, and Pep Boys

12  ultimately terminated Plaintiff's employment.  In a written statement at the end of the

13  investigation, Plaintiff represented that "[t]he total loss that [he] caused for the company is $20

14  and [he is] willing to pay back Pep Boys."  (Dkt. No. 180-3 at 28.)  Mr. MacDonald testified that

15  normally, based on an admission like that, Pep Boys would deduct $20 from the employee's

16  paycheck, but he did not know if Pep Boys did so or not.  (Dkt. No. 181-1 at 184-185.)  Similarly,

17  Plaintiff avers that at the conclusion of the interview, he and Mr. MacDonald "came to an

18  agreement for [Plaintiff] to pay $20.00 to Pep Boys as compensation for performing the oil change

19  and for use of the employee discount."  (Dkt. No. 181-2 ¶ 3.)  Mr. MacDonald informed Plaintiff

20  that "Pep Boys could civilly collect any monetary damages civilly from you depending on the

21  investigation[.]"  (Dkt. No. 136-3 ¶ 4.)  Mr. MacDonald also had Plaintiff sign a document entitled

22  "Civil Demand Notice," which similarly advised that Pep Boys might seek damages from

23  Plaintiff, including "the costs of security and any other damages/penalties permitted by law" and

24  that any questions should be directed to Palmer.  (*Id.* ¶¶ 5-6.)

25        Plaintiff paid Pep Boys $20 pursuant to the agreement he reached with Mr. MacDonald.[2]

26

27  [2] There is no evidence in the record that Plaintiff actually paid that amount: Plaintiff has not
submitted deposition testimony or a declaration averring as much, and Defendants have not
submitted any information either.  Nevertheless, Defendants concede that Pep Boys deducted $20

28  from Plaintiff's paycheck pursuant to that agreement.  (*See* Dkt. No. 185 at 7.)

1  (*Id.* ¶ 4.)

2       3.     <u>Palmer's Debt Collection Efforts</u>

3       Palmer is a Florida-based law firm that serves retail clients, including Pep Boys, seeking to

4  recover monetary losses from customers who have been accused of shoplifting and employees

5  accused of acts of theft or dishonesty.  (Dkt. No. 120-2 at 48.)  In May 2012, Plaintiff received a

6  letter from Palmer sent on Pep Boys' behalf.  The letter provides in relevant part:

7          This Law Firm represents Pep Boys concerning its civil claim
           against you in connection with an incident in their store 607 on
8          4/17/2012.

9          Pursuant to Cal. Penal Code § 490.5 "Theft of retail merchandise;
           civil liability", Pep Boys may consider moving forward with a
10         statutory civil damages claim against you.

11         ***We ask that you settle this matter by making payment to us in the***
           ***amount of $350.00 within twenty (20) days of the date of this letter.***
12         Upon receipt of full payment and clearance of funds, you will
           receive a written release of the statutory civil "penalty" claim.
13

14 (Dkt. No. 181-2 at 5 (emphasis in original).)  Plaintiff received a second letter from Palmer dated

15 June 12, 2012 with substantially similar language; the only thing that changed was the amount and

16 payment deadline: this time, the letter provided that "***[a]t this time, our client is requesting that***

17 ***you settle this matter by making payment to us in the amount of $625.00 within ten (10) days of***

18 ***the date of this letter.***"  (*Id.* at 7 (emphasis in original).)

19      Plaintiff responded in a letter dated June 7, 2012, writing that because Pep Boys "has failed

20 to provide adequate proof for the grounds for my termination, and has not delivered paperwork

21 detailing the itemized expenses it seeks to recover from this incident, I see no reason to make

22 payment."  (Dkt. No. 136-6 at 13.)  A couple of weeks later Plaintiff's attorney sent a further

23 response to Palmer's settlement demand letters, contending that California Penal Code § 490.5

24 does not apply because Plaintiff did not take any merchandise, and if anything he used Pep Boys'

25 labor in completing his own oil change, so Plaintiff would not be paying Palmer.  (*Id.* at 15-16.)

26 Palmer responded with a letter to Plaintiff's attorney explaining that it would no longer pursue the

27 settlement demand against Plaintiff and that the civil matter arising out of the Pep Boys incident

28 was "considered to be fully and finally resolved between the parties[.]"  (Dkt. No. 136-6 at 2 ¶ 17;

United States District Court
Northern District of California

*id.* at 21.)  Plaintiff never paid any money to Pep Boys as Palmer's letters requested.  (Dkt. No. 180-3 at 19.)  Pep Boys never filed any complaint against him.

**B.      Procedural History**

Plaintiff brings two claims against Defendants.  First, Plaintiff contends that Palmer and Hastings violated the FDCPA: (a) Section 1692g(a)(4) by failing to include in the settlement demand letter a statement that if the consumer disputes the debt, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification will be mailed to the consumer by the debt collector; (b) Section 1692g(a) by demanding payment of the alleged debt in less than 30 days; and (c) Section 1692e(11) by failing to state that the communications were sent on behalf of a debt collector.  On this FDCPA claim Plaintiff seeks actual and statutory damages as well as declaratory and injunctive relief.  Second, Plaintiff alleges that Palmer, Hastings, and Pep Boys engaged in unfair business practices in violation of California law by sending settlement demand letters seeking more than the $500 maximum that Penal Code § 490.5 permits, which Plaintiff contends violates the Unfair Competition Law's unlawful prong (predicated on a violation of the FDCPA), and the unfair prong (as the letters unfairly and incorrectly imply to the reader that Palmer could seek more than $500 pursuant to that statutory section).  As a result of this violation, Plaintiff seeks restitution and to enjoin Defendants from continuing to engage in their unlawful business practices.

By Order dated December 23, 2015, the Court denied Plaintiff's motion for class certification on either claim.  *Lee v. The Pep Boys-Manny Moe & Jack of Cal.*, No. 12-cv-05064-JSC, 2015 WL 9480475, at *1 (N.D. Cal. Dec. 23, 2015).  As for the FDCPA claim, the Court concluded that Plaintiff had failed to establish that the proposed class was sufficiently numerous or ascertainable or that his claim was typical of the class because of the dispute over whether Plaintiff engaged in a consensual consumer transaction giving rise to an FDCPA debt.  *Id.* at *7, 9.  As for the UCL claim, the Court concluded that Plaintiff's claim was not typical because the remedies available under the UCL—injunctive relief and restitution—were not available to him, and he was harmed, if at all, in a way distinct from the way the putative class was harmed.  *Id.* at *15.  The Court also found Plaintiff to be an inadequate class representative on both claims due to

United States District Court
Northern District of California

1    his deferral of control over this litigation to his attorneys.  *Id.* at *11, 16.  The Court thereafter

2    denied Keshaila Chang's motion to intervene on the UCL claim.  *Lee v. The Pep Boys-Manny Moe*

3    *& Jack of Cal.*, No. 12-cv-05064-JSC, 2016 WL 324015, at *9 (N.D. Cal. Jan. 27, 2016).

4    Defendants' motion for summary judgment and Plaintiff's motion for partial summary judgment

5    on Plaintiff's individual claims followed.  (Dkt. Nos. 180, 181.)  After oral argument, the parties

6    filed supplemental briefing about the availability of injunctive relief on Plaintiff's UCL claim.

7    (Dkt. Nos. 189, 190.)

**DISCUSSION**

**A.**     **First Claim for Relief: Violation of the FDCPA**

       Both parties seek summary judgment on various aspects of the FDCPA claim.  As a

preliminary matter, in the SAC Plaintiff brought this claim solely against Palmer and Hastings.

(*See* Dkt. No. 25 at 10.)  And indeed, during the course of this litigation, Plaintiff has consistently

alleged that Palmer and Hastings violated the FDCPA, while all Defendants (including Pep Boys)

should be held liable under the UCL.  (*See, e.g.*, Dkt. No. 119 at 17; Dkt. No. 120.)  Now, for the

first time in a footnote in his motion for partial summary judgment, Plaintiff suggests that he is

also entitled to judgment against Pep Boys on the FDCPA claim.  (*See* Dkt. No. 181 at 19 n.1

("Ninth Circuit authority supports a finding of liability against Pep Boys as well.") (citation

omitted).)  Without weighing in on whether this is true, Plaintiff has not brought the FDCPA claim

against Pep Boys and has not sought leave to amend the SAC to do so.  There is no FDCPA claim

against Pep Boys in this lawsuit.

       As for the FDCPA claim against Palmer and Hastings, Defendants argue that there is no

genuine dispute that Plaintiff's financial obligation to Pep Boys did not arise from a consensual

transaction and therefore the FDCPA does not apply to the letters at issue.  Plaintiff, for his part,

seeks partial judgment in his favor on two discrete legal issues relevant to this claim: first, that

there is no genuine dispute that there was a mutually consensual transaction—the same issue in

Defendants' motion—and second, that the letters' language violates the FDCPA.

       1.    <u>Whether Plaintiff's Claim Involves an FDCPA Debt</u>

       The FDCPA provides a cause of action for consumers who have been exposed to "abusive

United States District Court
Northern District of California

United States District Court
Northern District of California

debt collection practices by debt collectors." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (quoting 15 U.S.C. § 1692(e)).  A threshold issue on an FDCPA claim is whether the dispute involves a "debt" within the meaning of the statute.  *Id.*  The statute defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."  15 U.S.C. § 1692a(5).  Although the statute does not define "transaction," the Ninth Circuit has clarified that to qualify as a "debt" under the FDCPA, the transaction leading to the debt must be a consensual consumer transaction.  *Fleming*, 581 F.3d at 925.  Thus, liability deriving from theft or torts does not constitute a "debt" within the meaning of the FDCPA. *Fleming*, 581 F.3d at 925; *see also Beauvoir v. Israel*, 794 F.3d 244, 247 (2d Cir. 2015) (noting that the "sister circuits [that] have addressed the question [have] unanimously held that liability deriving from theft or torts does not constitute a 'debt' within the meaning of the FDCPA") (collecting cases from the Third, Seventh, Ninth, and Eleventh Circuits).

For example, in *Fleming*, the Ninth Circuit held that a cause of action for tortious conversion does not constitute a "debt" within the meaning of the FDCPA.  581 F.3d at 924.  The plaintiffs were third parties who had purchased stolen goods from an employee of a retailer.  *Id.* The defendants were assignees of a retailer's claims against third parties, who had sued the plaintiffs to recover the value of the stolen merchandise.  *Id.*  The court concluded that the plaintiffs' obligation to the retailer was not a debt within the meaning of the FDCPA because, even though the plaintiffs had purchased the goods from the retailer's employee, that transaction was not consensual since the retailer did not give the employee consent to steal the merchandise in the first instance.  *Id.* at 926.

Here, the two transactions that Plaintiff has long argued underlie his financial obligations are Plaintiff's performance of an oil change on his own car while on the clock and his misuse of his employee discount.  Plaintiff also argues now for the first time that his later agreement with internal investigator Shaun MacDonald to pay Pep Boys $20 separately satisfies the consensual transaction requirement.  The Court will address each in turn.

a.   *The Oil Change*

The financial obligation Plaintiff allegedly owed Pep Boys as a result of the unauthorized oil change did not arise from a consensual transaction.  It is undisputed that Pep Boys did not permit non-flat rate associates, like Plaintiff, to work on their own cars.  (Dkt. No. 136-1 ¶ 5; *id.* at 7-8; Dkt. No. 181-1 at 180.)  Moreover, even if Plaintiff had been working in a position that made him *eligible* to work on his own car at work, he concedes that he did seek a manager's permission in advance as required and worked on the car while he was on the clock, contrary to policy.  (*See* Dkt. No. 136-1 at 7; Dkt. No. 181-1 at 180, 182-183.)  Nor is there any evidence in the record suggesting that Plaintiff met any of the other prerequisites to working on his own car, such as obtaining a release or work order.  (*See* Dkt. No. 136-1 ¶ 5; *id.* at 7.)  In short, there is no genuine dispute that Plaintiff's unauthorized work on his own car was not consensual because Pep Boys did not allow him to perform the work.

Plaintiff's insistence that an employee/employer relationship always creates an FDCPA debt is wrong.  The cases upon which Plaintiff relies do not so hold.  In *Berman v. GC Services Limited Partnership*, 146 F.3d 482 (7th Cir. 1998), the Seventh Circuit held that unemployment insurance contributions do *not* qualify as "debts" under the FDCPA.  *Id.* at 487.  The court noted that the contributions themselves "meet the first part of the definition of 'debt' because there is a consensual transaction, the hiring of an employee," but the contributions were nonetheless not qualifying debts because they were not for personal, family, or household purpose as the statute requires.  *Id.*  Thus, Plaintiff's assertion that an employment relationship always gives rise to a debt finds no foundation in *Berman*.

Plaintiff's reliance on *Kreisler v. Latino Union, Inc.*, No. 06 cv 3968, 2007 WL 1118408, at *4-5 (N.D. Ill. 2007), fares no better.  There, the plaintiff entered into an agreement with a contractor to perform work on the plaintiff's basement, and the contractor engaged a subcontractor to perform part of the work.  2007 WL 1118408, at *1.  The contractor did not pay the subcontractor for the work performed.  *Id.* at *2.  The defendant, a nonprofit organization that employs "wage theft advocates," assisted the subcontractor in recovering his unpaid wages by mailing a letter to the plaintiff seeking payment of the amount the contractor owed the

9

1  subcontractor, and the plaintiff contended that the letter violated the FDCPA. *Id.* The nonprofit

2  argued, among other things, that there was no "debt" within the meaning of the statute. *Id.* at *2.

3  The court determined that the plaintiff had sufficiently alleged that the agreement to hire the

4  contractor, who in turn hired the subcontractor, was an FDCPA debt obligation. *Id.* at *5.

5  *Kreisler* stands for the unremarkable proposition that contracts for construction work are

6  consensual transactions. It does not hold that non-contractual unauthorized work can give rise to

7  an FDCPA debt simply because it occurred in the context of an employee/employer relationship.

8       Plaintiff's suggestion that the "transaction" underlying the oil change financial obligation

9  is Plaintiff's purchase of oil and an oil filter fares no better. Pep Boys has never contested that

10  Plaintiff properly paid for the oil and oil filter he used; instead, the record is undisputed that the

11  financial obligation comes from Plaintiff's on-the-clock performance of personal services.

12       Plaintiff's heavy reliance on the Court's Order granting in part and denying in part

13  Defendants' motion to dismiss is similarly misplaced. There the Court concluded that the "FAC

14  supports an inference that it was Pep Boys' policy that if an employee changed his oil at work, the

15  employee must pay for his labor[,]" which was enough to plausibly allege that Plaintiff's

16  "obligation to pay arose out of the agreement that if an employee changes the oil in his car he must

17  pay for his labor." (Dkt. No. 23 at 8.) Based on this reasoning, Plaintiff urges that "it is

18  undisputed" that the oil-change transaction was consensual and voluntary. This argument ignores

19  Plaintiff's summary judgment burden. While the FAC allegations might have given rise to a

20  plausible inference that that was such a policy, the evidence now before the Court leaves no

21  dispute that Pep Boys' policy did not allow Plaintiff to change the oil on his car, no exceptions. In

22  other words, the *evidence* does not support an inference that Pep Boys had a policy that permitted

23  Plaintiff to perform the oil change provided he repay the cost of labor. Instead, Pep Boys' policy

24  did not allow Plaintiff to perform the work in the first place, so the provision of services was not a

25  consensual transaction. At bottom, Plaintiff does not cite any authority that supports his position

26  that unauthorized use of employee services can give rise to an FDCPA debt. And indeed,

27  concluding as much would be contrary to *Fleming* and other Ninth Circuit authority.

28       Plaintiff's reliance on bad check cases is unpersuasive. He cites *Irwin v. Mascott*, 112 F.

Supp. 2d 937, 963 (N.D. Cal. 2000), in which the plaintiffs were consumers who purchased goods with checks that bounced. *See id.* at 948. There, the court concluded that the debt collection letters that followed, which like Palmer's letters cited Penal Code Section 490.5, violated the FDCPA because there was no basis for the defendant to believe that the plaintiffs had committed larceny. *Irwin* is distinguishable on its facts. The problem there was that there were no facts indicating that the check-writers did not actually intend to pay for the merchandise because "[t]he failure of a buyer's check to clear does not make the buyer a shoplifter." *Id.* at 948. Here, in contrast, it is undisputed that Plaintiff was not authorized to service his car in the first place, regardless of whether he attempted to pay for his labor in servicing his car. Moreover, in *Fleming*, the Ninth Circuit distinguished between financial obligations arising out of dishonesty, like theft or conversion, and debts arising from bad checks, noting that not all dishonored checks evidence tortious or criminal activity and instead often reflect "consumers with honest intentions to pay the full price for legitimately acquired goods[.]" 581 F.3d at 926. Plaintiff's scenario is more akin to *Fleming* than to the dishonored check cases: there is no genuine dispute that Pep Boys did not permit the oil change in the first place, regardless of whether Plaintiff intended to pay for his labor (and there is no evidence that he did). The unauthorized oil change was not a consensual transaction giving rise to an FDCPA debt.

b.    *Misuse of Plaintiff's Employee Discount*

Plaintiff's misuse of his employee discount presents a different picture. In their motion, Defendants focus on Plaintiff's provision of his employee discount to Ms. Bacca, contending that it is undisputed that Plaintiff's financial obligation arising out of that incident was not consensual and therefore not a debt within the meaning of the FDCPA. Plaintiff argues that his use of his employee discount both for Ms. Bacca and for his mother are each consensual transactions that qualify as FDCPA debts.

i.    Use of the Discount for Ms. Bacca

It is well-established that the purchase of merchandise is the type of consumer transaction that gives rise to a debt within the FDCPA's reach. *See, e.g.*, *Gold v. Midland Credit Mgmt., Inc.*, 306 F.R.D. 623, 631 (N.D. Cal. 2014) (discussing the plaintiff's FDCPA claim arising out of the

11

1  purchase of personal and household goods and services).  Defendants even appear to concede as

2  much.  (*See* Dkt. No. 180 at 15.)  However, while Plaintiff's obligation to pay the difference

3  incurred by Ms. Bacca's unauthorized use of his discount arose from a consumer transaction, the

4  use of the discount—and thus, the portion of the transaction that gave rise to Plaintiff's obligation

5  to pay—was not consensual.  There is no genuine dispute that Pep Boys did not consent to Ms.

6  Bacca's use of the discount because it was contrary to company policy inasmuch as Pep Boys did

7  not permit its employees to give their discount codes to friends, as Plaintiff did.  (*See* Dkt. No.

8  136-1 ¶ 5; *id.* at 5; Dkt. No. 136-2 ¶ 6; Dkt. No. 136-3 ¶ 10; Dkt. No. 180-3 at 32, 174; Dkt. No.

9  181-1 at 176.)  This is true even if, as Plaintiff avers, his shop manager rang up the transaction, as

10  there is no record evidence that a manager can override company policy.

11       Plaintiff's insistence that the policy was not clear—and thus, that there remains a genuine

12  dispute about whether the transaction was consensual—is unavailing.  Despite the existence of

13  more than one iteration of the same policy, including one that indicated that employees may only

14  provide their discount for spouses, one that listed spouses and children, and one that listed

15  spouses, children, and any dependents, and even Mr. MacDonald's statement that different

16  employees could have more than one interpretation of the same policy regarding what *family*

17  members were permitted to use the discount,[3] one thing remains clear: the policy does not permit

18  employees to give their discount to friends.

19       Moreover, the Bacca transaction fails to garner *Plaintiff* protection as an FDCPA debt for

20  another reason: it is undisputed that he was not a party to the underlying transaction.  Instead, Ms.

21  Bacca was the party who purchased the goods using Plaintiff's employee number for the discount,

22

23  _____

[3] Plaintiff suggests in his opposition to Defendants' motion and in his motion for partial summary
24  judgment that MacDonald testified as Pep Boys' corporate representative regarding the employee
   discount policy and therefore implies that his testimony should be binding on the company.  (*See*
25  Dkt. No. 181 at 17 (noting that "Defendants have identified Shaun MacDonald as the witness most
   knowledgeable concerning Pep Boys' discount policy and practices" then describing his
26  testimony).)  While Plaintiff so identified MacDonald initially, Plaintiff did not notice
   MacDonald's deposition as a Rule 30(b)(6) witness but only in his individual capacity since he no
27  longer worked at Pep Boys.  (*See* Dkt. No. 183-2 at 4.)  While Plaintiff's counsel asked questions
   during the deposition further suggesting that MacDonald was a 30(b)(6) witness (*see, e.g.*, Dkt.
28  No. 181-1 at 171), defense counsel was under Court Order to refrain from objecting.  (See Dkt.
   No. 118.)  The Court construes MacDonald's testimony as being made in his individual capacity.

United States District Court
Northern District of California

1    and Plaintiff was not even at the Pep Boys' store at the time of purchase.  (Dkt. No. 180-3 at 10-

2    12; Dkt. No. 136-3 ¶ 11.)  The Ninth Circuit has not yet addressed this particular scenario—that is,

3    when a retailer attempts to recover from employees the amount of money deducted from a third

4    party's improper use of the employee's discount.  However, at least one district court has

5    concluded that an employer's efforts to obtain recovery from employees who extend their discount

6    privilege to unqualified third parties do not fall within the FDCPA's reach because the discounted

7    transactions giving rise to the employee's alleged financial obligation were between third parties

8    and the employer, not the plaintiff and the employer.  *Helsel v. Gen. Motors, LLC*, No.

9    1:12CV1184, 2013 WL 4049519, at *4 (N.D. Ohio Aug. 9, 2013).  *Helsel* was an FDCPA case

10   brought against an employer that "sought reimbursement for discounts it alleged were fraudulently

11   obtained by Plaintiffs for third party purchasers of GM vehicles."  *Id.* at *4.  There, the court

12   concluded that the plaintiffs' obligation to repay the discount did not arise out of the third party

13   vehicle purchases, but "out of the employee benefit offered by GM to its employees per the GM

14   benefit plan."  *Id.* at *5.  Put another way, "the third party purchases conferred no obligation on

15   the Named Plaintiffs; instead, it was the use of the employee discount[,]" and because the

16   employees did not purchase anything or spend any money when the third parties made their

17   purchases, "the underlying consumer transaction by third party automobile purchasers did not

18   impose a debt obligation on the named Plaintiffs" so there was no 'debt' for the purposes of the

19   FDCPA.  *Id.* at *5 (citing *Fleming*, 581 F.3d at 925-26).  So too here.  It is undisputed that

20   Plaintiff was not involved in Ms. Bacca's transaction: he did not spend any money and was not a

21   party to the transaction.  His purported obligation to repay the amount of the discount arose from

22   the improper sharing of his employee discount, not from Ms. Bacca's purchases themselves,

23   which did not bind him to any financial obligation whatsoever.

24          Plaintiff's attempts to distinguish *Helsel* are unpersuasive.  Plaintiff argues that *Helsel* is

25   inapposite because there, the employer filed lawsuits for conversion and fraud against the

26   plaintiffs relating to use of the plaintiffs' employee discount, whereas here Plaintiff brings his

27   FDCPA claim against a debt collector, not his employer.  (*See* Dkt. No. 184 at 18.)  This is beside

28   the point.  The relevant analysis in *Helsel* is the genesis of the initial debt, not the manner in which

a particular entity sought to collect it. *See* 2013 WL 4049519, at *4-5. Plaintiff also argues that Defendants misread *Helsel* to require the plaintiff's physical presence to give rise to a debt. (*See* Dkt. No. 184 at 19.) Regardless of Defendants' position, the point in *Helsel* is that a transaction to which the plaintiff is not a party does not constitute a consumer transaction that triggers the absent plaintiff's FDCPA rights. *See* 2013 WL 4049519, at *4-5. Physical presence is not the lynchpin here; being a party to the transaction in a manner that results in legal obligations is. As Plaintiff was not a party to the transaction in which Ms. Bacca improperly used his employee discount, her purchases were not a "transaction" between Pep Boys and Plaintiff and did not impose an FDCPA debt obligation on Plaintiff.

Plaintiff's reliance on *Ruth v. Tenen*, No. 3:12cv40-WHA, 2012 WL 2135478 (M.D. Ala. June 13, 2012), is also unpersuasive. There, the plaintiff improperly used his employee discount to purchase a television from Best Buy when he should have paid the full retail price. *Id.* at *2. After the plaintiff agreed to repay the difference, Best Buy fired him for improper use of the employee discount, and he did not pay the debt. *Id.* A debt collector then sent the plaintiff a letter seeking payment of the outstanding debt arising out of the plaintiff's written agreement to repay the difference. *Id.* The court held that the plaintiff's indebtedness for improper use of the employee discount was a debt for the purposes of the FDCPA, noting that "the obligation arose out of a consumer transaction in which the plaintiff paid for a household good, but failed to pay the full retail amount for the good." *Id.* at *3. The court further found that the plaintiff's later agreement to repay the difference was also a "consumer transaction" giving rise to an FDCPA debt because it arose out of the initial purchase. *Id.* at *4. Unlike *Ruth*, here Plaintiff did not make the purchase in Ms. Bacca's transaction. Nor did he make any purchase in connection with Ms. Bacca's oil change. Put simply, Plaintiff's provision of his employee discount to Ms. Bacca is more akin to *Helsel* than *Ruth*, and for the same reasons as *Helsel*, it cannot serve as a consensual transaction giving rise to an FDCPA debt.

Contrary to Plaintiff's assertion, this conclusion is not inconsistent with the Court's Order concluding that the FAC adequately alleged a consumer transaction. The FAC had alleged that Plaintiff purchased the goods for family and friends, and the Court reasoned that this allegation,

14

taken as true, was enough to conclude that there was a consensual consumer transaction giving rise to a debt.  But the evidence now before the Court with regard to Ms. Bacca's purchase belies that allegation.  Accordingly, it is undisputed that the financial obligation Plaintiff owed Pep Boys due to Ms. Bacca's unauthorized use of his employee discount was not a consensual transaction that gave rise to an FDCPA debt.

       ii.  Use of the Discount for Plaintiff's Mother

  In addition to Ms. Bacca, Plaintiff also used his employee discount for the car of his mother, Chung Wah Lee, and on that occasion the transaction was between Plaintiff and Pep Boys, not the third party and Pep Boys.  (Dkt. No. 180-3 at 11; *see also* Dkt. No. 181-2 ¶ 2.)  Thus, unlike Ms. Bacca's transaction, this instance of Plaintiff's misuse of the employee discount does reflect that *Plaintiff* entered into a consumer transaction with Pep Boys.

  Further, a genuine dispute exists as to whether that transaction was consensual.  Mr. MacDonald testified that Pep Boys' policy permits an employee to use the discount himself and for his spouse, children, and dependents on tax returns, and explained that the three relevant versions of the policy provide that the discount can be used for (1) spouses, (2) spouses and dependents, and (3) spouses and dependent children.  (Dkt. No. 181-1 at 175, 177.)  Plaintiff told Mr. MacDonald that he was supporting his parents.  (*Id.* at 178.)  Plaintiff repeatedly emphasizes in his papers, albeit without citing to any factual support, that he resides with his mother.  (*See, e.g.*, Dkt. No. 186 at 14.)  The Court has found testimony from Plaintiff stating that he lived with his mother at the time of the incidents.  (Dkt. No. 136-10 at 37.)  Aside from living together, Plaintiff has not offered any admissible evidence that his mother was a dependent (rendering the transaction consensual), but nor has Defendant offered any evidence that Plaintiff's mother was *not* a dependent (rendering the transaction nonconsensual).  Thus, there remains a genuine dispute whether Plaintiff's use of his employee discount for his mother was a consensual transaction giving rise to an FDCPA debt.

  Defendants nonetheless contend that it is undisputed that Palmer's letters stemmed only from the Bacca violation—not the transaction in which Plaintiff used the discount for his mother—so the mother transaction is irrelevant.  They rely on the declaration of Shaun

United States District Court
Northern District of California

MacDonald, submitted in support of their reply, which states that Plaintiff admitted using the discount for his mother, and while Mr. Macdonald believed this to be a policy violation, he "assured [Plaintiff] that he was not worried about the possible violation with regard to his mother" because he had already determined that Plaintiff had violated Pep Boys policy with respect to the oil change and extending his discount to Ms. Baca.  (Dkt. No. 185-1.)  But Mr. MacDonald's incident report referenced Plaintiff's use of the employee discount for both a friend *and* his mother (Dkt. No. 181-1 at 262), and the debt collection letters themselves are silent about the specific incidents underlying the claimed financial obligation.  On this record the Court cannot conclude as a matter of law that Palmer's letters stemmed *only* from the Bacca violation and not the transaction involving Plaintiff's mother.  Put another way, whether Palmer's letters sought to collect the money Pep Boys lost when Plaintiff used the discount for his mother or only the money stemming from the oil change and Ms. Bacca's transaction is in genuine dispute.

As explained above, although Defendants have established beyond dispute that the oil change and Ms. Bacca's transaction were not consensual and therefore did not give rise to FDCPA debts, it remains disputed whether Plaintiff's use of his employee discount for his mother was consensual and whether that transaction served as the basis for the collection letters he later received.  If a fact finder were to answer both questions in the affirmative, then Defendants' letters could have arisen from an FDCPA debt.

### c.   *Plaintiff's $20 Payment to Pep Boys*

Next, Plaintiff urges that even if the incidents described above were nonconsensual transactions in the first instance, "Pep Boys' acceptance of Plaintiff's $20 "constitutes the consent necessary for the FDCPA to apply" (Dkt. No. 186 at 13); put another way, he contends that Pep Boys' acceptance of Plaintiff's $20 payment for outstanding financial obligations arising out of the oil change and employee discount transactions rendered those earlier transactions consensual.[4] (Dkt. No. 186 at 13.)

Assuming, without deciding, that there is a genuine dispute about whether the $20 that

---

[4] Contrary to Defendants' interpretation, Plaintiff is not arguing that the $20 payment itself is the consensual transaction that constitutes the FDCPA debt.  (*See* Dkt. No. 183 at 13.)

United States District Court
Northern District of California

Plaintiff paid Pep Boys was meant to satisfy all of the alleged violations, Plaintiff does not cite any authority to support his position that later payment can render an earlier nonconsensual transaction consensual.  *Ruth* actually hurts Plaintiff's argument: there the court concluded that the plaintiff's later agreement to repay money owed was a debt-creating consensual transaction because it arose out of an earlier consensual transaction—*i.e.*, the plaintiff's qualifying purchase.  *See* 2012 WL 2135478, at *4.  In any event, Plaintiff's argument makes no sense.  Either it was consensual at the time the transaction occurred or it was not.  What Plaintiff is really arguing is that the $20 payment extinguished any right of Defendants to seek to collect any further payment from Plaintiff.  Perhaps.  But that is a different issue from whether the initial financial obligations arose from consensual transactions.  They did not, and thus the FDCPA does not apply to Defendants' efforts to collect on those obligations.

*   *   *

In sum, Defendants are entitled to summary judgment on the question of whether an FDCPA debt exists with respect to the oil change and Ms. Bacca's transaction, as it is undisputed that these two transactions were not consensual and therefore cannot serve as FDCPA debts and the $20 payment to Pep Boys did not render these earlier transactions consensual.  However, there remains a genuine dispute about what money Defendants were collecting when they sent Plaintiff the letters at issue.  To the extent the jury finds that the letters sought to collect only on the oil change and Ms. Bacca transaction, as Defendants argue, they will be entitled to judgment.  However, because a jury could find that the letters were also collecting on the financial obligation arising out of Plaintiff's use of his employment discount for his mother, which a jury reasonably could deem to be a consensual transaction, Defendants are not entitled to summary judgment regarding the existence of an FDCPA debt.

2.      Whether Defendants' Letters Violated the FDCPA

Plaintiff also seeks a ruling that the demand letters violate several provisions of the FDCPA; that is, assuming the statute applies, the letters ran afoul of it.  Specifically, Plaintiff argues that the letters violate: (1) Section 1692g(a)(4) by failing to including a statement that if the consumer disputes the debt, the debt collector will send verification to the consumer; (2) Section

1692g(a) by demanding payment of the alleged debt in less than 30 days; (3) Section 1692e(11) by failing to state that the communications were sent on behalf of a debt collector; and (4) Section 1692f(1) by threatening a demand of attorneys' fees when there is no underlying statute that permits the debt collector to seek fees from the debtor.[5]   Assuming for the purposes of argument that the FDCPA applies, Defendants do not dispute the first three violations and challenge only the fourth.  In other words, Defendants do not dispute that *if* the FDCPA applies, Defendants' letters violate the FDCPA by failing to include the requisite debt dispute language, demanding payment in less than 30 days, and failing to state that the letters are being sent on behalf of a debt collector. While the nonmoving party's failure to oppose summary judgment "does not excuse the moving party's affirmative duty to demonstrate entitlement to judgment as a matter of law" on a particular issue, *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003), here the letters plainly fail to include this information, so *if* the FDCPA were to apply, there is no dispute that the letters would violate these three statutory provisions.

Defendants do challenge the fourth alleged violation—that the letters violate Section 1692f(1) by demanding attorneys' fees.  That provision specifies that it is a violation of the FDCPA to "collect[] . . . any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  The letters state: "Pep Boys may in the future consider filing a lawsuit, in which case it will likely seek any available attorney's fees, court costs and other legal expenses throughout such litigation" and, if successful, "Pep Boys would be seeking a final judgment of damages, attorney's fees and court costs up to the maximum amounts allowed by law which might exceed the amount demanded above."  (Dkt No. 181-1 at 60, 61.)  Plaintiff argues that this language violates section 1692f(1).

Plaintiff has not established that he is entitled to summary judgment on this claim.  The

---

[5] Plaintiff's Notice of Motion for Partial Summary Judgment identifies the fourth issue as whether Defendants violated 15 U.S.C. § 1692f(1) by (1) seeking more than permitted by California Penal Code section 490.5 and (2) "threatening a demand of attorneys' fees when there is no underlying statute which permits attorneys' fees to be sought from the debtor."  (Dkt. No. 181 at 2:22-25.)  The memorandum in support of the motion, however, only addresses the attorneys' fees argument. (*Id.* at 19:17-19, 20.)  The Court will therefore address only the attorneys' fees argument.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   letters do not involve the attempted collection of attorneys' fees.  The letters state that if Pep Boys

2   files a lawsuit, it may seek attorneys' fees and if successful in that lawsuit, it make seek to recover

3   attorneys' fees.  The letters do not themselves attempt to recover any attorneys' fees from

4   Plaintiff.  And no lawsuit was ever filed.

5       The only authority cited by Plaintiff is unhelpful.  *Del Campo v. American Corrective*

6   *Counseling Services, Inc.*, 718 F. Supp. 2d 1116, 1133 (N.D. Cal. 2010), does not compel the

7   conclusion that the letter violates Section 1692f(1).  There, the defendants sent collection letters to

8   plaintiffs who had written dishonored checks; specifically, the defendants sought payment of the

9   check amount, a $10 "returned item" fee, a $35 "administrative fee," and a "program fee" ranging

10  from $125 to $140.  *Id.* at 1133.  State law authorized the returned item fee and the administrative

11  fee, but not the program fee.  *Id.*  Accordingly, the court held that the defendants' request for the

12  program fee violated Section 1692f(1).  *Del Campo* involved a collection letter that actually

13  attempted to collect an improper fee.  It does not suggest that a collection letter that alludes to fees

14  that might sought to be collected in a lawsuit, if one is ever filed, violates section 1692f(1).

15  Plaintiff's motion for summary judgment on this issue is denied.

16                                          *   *   *

17      It is undisputed that *if* the FDCPA applies, Defendants' letters violate the first three

18  FDCPA sections alleged: 1692g(a)(4), 1692g(a), and 1692e(11).  Plaintiffs are therefore entitled to

19  partial summary judgment that *if* the FDCPA applies, then Defendants' letters violated those

20  provisions as a matter of law.  Plaintiff's motion for partial summary judgment on the Section

21  1692f(1) claim is denied as he has not shown as a matter of law that stating in a collection letter

22  that attorneys' fees might be sought in a subsequent lawsuit violates that provision.

23  **B.      Second Claim for Relief: Violation of the UCL**

24      Both parties also seek judgment in their favor on the UCL claim, which Plaintiff brings

25  against all Defendants.  Defendants contend that they are entitled to summary judgment because

26  Plaintiff is not entitled to either restitution or injunctive relief—the only remedies for a UCL

27  violation.  Plaintiff counters that the Court should grant partial summary judgment in his favor on

28  the UCL claim by making the following conclusions of law: (1) Plaintiff has standing to seek

injunctive relief and restitution; (2) Defendants' debt collection letters are unfair and unlawful because they violate the FDCPA; and (3) Defendants' debt collection letters are unlawful because they violate California Penal Code Section 490.5.

### 1.   Legal Standard

The UCL prohibits any "unlawful, unfair or fraudulent business practice[.]"  Cal. Bus. & Prof. Code § 17200.  Because the statute is written in the disjunctive, it prohibits three separate types of unfair competition: (1) unlawful acts and practices, (2) unfair acts or practices, and (3) fraudulent acts or practices.  *Cel-Tech Comm'cns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citation omitted).  To succeed on a UCL claim under any of these theories, a plaintiff must establish that the defendant engaged in one of the practices that the statute prohibits and that, as a result of that conduct, he or she suffered actual injury.  *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1003 (N.D. Cal. 2009).

### 2.   Analysis

Plaintiff has alleged an "unlawful" UCL claim premised on a finding of a violation of the FDCPA.  Plaintiff also has remaining a UCL "standalone" claim based on his allegation that it was "unfair" for Defendants to seek from Plaintiff in the second demand letter more than the $500 awardable under California Penal Code section 490.5.  (Dkt. No. 77.)

#### a.   *Defendants' Motion: Whether Plaintiff is Entitled to UCL Remedies*

The Court begins with Defendants' motion, which does not address the merits of the UCL claim but instead argues that Plaintiff's UCL claim fails because he is not entitled to restitution or injunctive relief.  These are the only remedies available under the UCL.  *See Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 452 (2005).

##### i.   Restitution

"[I]n the context of the UCL, 'restitution' is limited to monies given to the defendant or benefits in which the plaintiff has an ownership interest."  *Korea Supply Co. v. Lockheed Martin Co.*, 29 Cal.4th 1134, 1148 (2003).  Put simply, UCL restitution is limited to money in the hands of the defendants due to the alleged unfair business practices.  In the class certification order, the Court noted that Plaintiff did not allege any such money here: "he did not pay any settlement

1   funds to Palmer or Pep Boys in response to the settlement demand letter[.]"  *Lee*, 2015 WL

2   9480475, at *15 (record citations omitted).

3           Plaintiff appears to concede that he cannot seek restitution from Palmer or Hastings.  (*See*

4   Dkt. No. 181 at 21.)  However, apart from the settlement demand letter, he contends that Pep Boys

5   coerced and forced him under duress to pay $20 for the disputed debt and that he is entitled to

6   restitution of that amount.[6]  (Dkt. No. 25 ¶ 35; *see* Dkt. No. 184 at 20-21; *see also id.* at 8

7   (describing Plaintiff's statements to Mr. MacDonald that Plaintiff felt threatened by Mr.

8   MacDonald during his interview).)  The problem with this argument is that earlier in the case

9   Plaintiff disavowed any such claim.  Defendants previously moved for judgment on Plaintiff's

10  UCL claim "to the extent that claim does not depend upon an alleged violation of the FDCPA."

11  (Dkt. No. 77 at 4:6-7.)  "Following a Court-ordered phone call between the parties, Plaintiff

12  identified Paragraph 34, subsections (a) and (b), of the SAC as the allegations supporting his

13  'standalone' UCL claim."  (*Id.* at 4:7-9; *see also* Dkt. No. 70-1 at 7:18-23, 25; *id.* at 8:1-4; *id.* at

14  13:6-9; Dkt. No. 25 ¶ 34; Dkt. No. 77 at 4:6-9.)  Any UCL claim involving restitution of the $20 is

15  not pled in those paragraphs, nor in the paragraphs pertaining to Plaintiff's non-standalone UCL

16  claim—*i.e.*, the unlawful UCL prong claim premised on underlying violation of the FDCPA,

17  which does not pertain to Pep Boys, and an underlying violation of Penal Code Section 490.5, a

18  claim for which the Court has already entered judgment in Defendants' favor.  (*See* Dkt. No. 25

19  ¶ 23; Dkt. No. 77 at 8-9.)  Thus, Plaintiff has waived any UCL claim based on the allegedly

20  coerced $20 payment.  And due to the timing, Plaintiff cannot show that the $20 payment was the

21  result of—*i.e.*, caused by—the other alleged unlawful conduct (that is, the letters), defeating the

22  required causation.  *See Kwikset*, 51 Cal.4th at 322; *In re Tobacco II Cases*, 46 Cal.4th at 315.

23  Accordingly, Defendants are entitled to summary judgment on any UCL claim for restitution.

24                              ii.      Injunctive Relief

25          Defendants contend that because they dropped their settlement demand against Plaintiff, he

26

27  ───────────────
    [6] In doing so, Plaintiff cites allegations in the FAC that he lost the $20 when Pep Boys deducted it
    from his paycheck (Dkt. No. 814 at 20 (citing FAC ¶ 24)), but the same allegation appears in the
28  SAC.  (Dkt. No. 25 ¶ 23.)

United States District Court
Northern District of California

1    is "not entitled to an injunction prohibiting Defendants from sending more letters because he is not

2    in danger of getting any." (Dkt. No. 180 at 14:21-23.) As support for this argument, Defendants

3    cite to this Court's Order denying Plaintiff's motion for class certification. The Court noted in that

4    Order that injunctive relief is generally limited to ongoing wrongs, or wrongs with a likelihood of

5    occurring in the future. *Lee*, 2015 WL 9480475, at *15 (citing *Ellis v. Costco Wholesale Corp.*,

6    657 F.3d 970, 978-79 (9th Cir. 2011)). Injunctive relief is not otherwise available because

7    "[u]nder Article III, 'to establish standing to pursue injunctive relief . . . [plaintiffs] must

8    demonstrate a real and immediate threat of repeated injury in the future." *Rasmussen v. Apple,*

9    *Inc.*, 27 F. Supp. 3d 1027, 1045 (N.D. Cal. 2014) (citation omitted) (second alteration in original);

10   *see also Armstrong v. Davis*, 275 F.3d 849, 960-61 (9th Cir. 2001) (noting that a prerequisite to

11   injunctive relief is a demonstration that the plaintiff is "realistically threatened by a repetition of

12   the violation") (citation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)

13   (the plaintiff bears the burden of establishing future injury that needs to be enjoined).

14           Some courts have nonetheless expressed doubt as to whether a plaintiff who proves a

15   violation of the UCL should be precluded from obtaining injunctive relief merely because the

16   plaintiff faces no realistic threat of suffering an injury from the defendant's conduct in the future.

17   *See, e.g.*, *Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JST, 2015 WL 1248027, at *3 (N.D. Cal.

18   Mar. 18, 2015); *Koehler v. Litehouse, Inc.*, No. CV 12-04055 SI, 2012 WL 6217635, at *6 (N.D.

19   Cal. Dec. 13, 2012); *Cabral v. Supple, LLC*, No. EDCV 12-000085-MWF (OPx), 2012 WL

20   4343867, at *2-3 (C.D. Cal. Sept. 19, 2012); *Henderson v. Gruma Corp.*, No. CV 10-04173 AHM

21   (AJWx), 2011 WL 1362188, at *7-8 (C.D. Cal. Apr. 11, 2011). The Court questions whether the

22   reasoning of these cases would apply here, as all of them, including those cited by Plaintiff in his

23   supplemental submission, were putative class actions. *See, e.g.*, *Henderson*, 2011 WL 1362188, at

24   *8 ("Plaintiffs, *as representatives of a class*, should be entitled to pursue injunctive relief on

25   behalf of all consumers in order to protect consumers from Defendant's alleged false

26   advertising.") (emphasis in original). Here, in contrast, the Court has already determined that class

27   certification is not appropriate.

28           Plaintiff's supplemental submission also cites several cases in which a court held that a

1   plaintiff could pursue injunctive relief on behalf of aggrieved members of the public under the

2   UCL notwithstanding not proceeding as a class action.  (Dkt. No. 190 at 1.)  However, each of

3   these cases was decided prior to the Proposition 64 amendment to the UCL.[7]  Since 2004, Section

4   17203 of the UCL has provided that "[a]ny person may pursue representative claims or relief on

5   behalf of others only if the claimant meets the standing requirements of Section 17204 and

6   complies with Section 382 of the Code of Civil Procedure."  Cal. Bus. & Prof. Code § 17203; *see

7   also Henderson*, 2011 WL 1362188, at *3.  Section 17204, in turn, provides that a UCL claim for

8   injunctive relief can only be prosecuted by district attorneys and similar government prosecutors

9   as well as "a person who has suffered injury in fact and has lost both money or property as a result

10  of the unfair competition."  Cal. Bus. & Prof. Code § 17204.

11          Taking the last requirement—causation—first, as to the "unlawful" UCL claim premised

12  on the FDCPA violation, a single FDCPA claim remains for trial: namely, the claim arising from

13  the settlement demand letters premised on the allegedly consensual transaction involving Plaintiff

14  using his employee discount for his mother.  If, and only if, Plaintiff ultimately prevails on this

15  claim does the Court need to determine whether injunctive relief under the UCL is appropriate.  It

16  is worth noting, however, that given the nature of the claim, any such injunctive relief would be

17  quite limited as it would only apply to consensual transactions, a circumstance that likely makes

18  injunctive relief inappropriate if not impossible to craft and likewise difficult to enforce, if the

19  debate into the consensual nature of Plaintiff's transactions is any indicator.  Further, the Court

20  would have to find that the violation—the unfair competition—caused Plaintiff to lose money or

21  property.  *See* Cal. Bus. & Prof. Code § 17204; *Kwikset*, 51 Cal.4th at 322.  The only money or

22  property still at issue that Plaintiff lost is the $100 he paid to his attorney; thus, at trial the burden

23

24  [7] *Montano v. Bonnie Brae Convalescent Hospital, Inc.*, 79 F. Supp. 3d 1120, 1134 (C.D. Cal.
    2015), is the exception.  In holding that a UCL plaintiff can obtain injunctive relief on behalf of

25  others notwithstanding the lack of a class action, the court cited exclusively to pre-Proposition 64
    cases and did not address the limitations on representative claims imposed by Section 17203.  *See

26  id.* at 1134-35.  More importantly, however, the plaintiff himself had a claim for injunctive relief
    as he still lived at the defendant facility—indeed, the ordered injunctive relief included requiring

27  accommodations specific to the plaintiff.  *Id.* at 1135.  *Montano* thus does not support Plaintiff's
    argument that even though Defendants' allegedly unfair conduct is unlikely to harm Plaintiff in

28  the future, he can obtain an injunction to prevent harm to others notwithstanding the denial of
    class certification.

United States District Court
Northern District of California

1    will be on Plaintiff to show that he lost that money because of the particular FDCPA violation

2    (assuming he prevails in showing that the FDCPA applies at all).  While Plaintiff may not be able

3    to meet this burden at trial, Defendants did not move for summary judgment on that ground.

4         Injunctive relief premised on the alleged "unfair" UCL violation arising from the demand

5    for more money than is allowed by Penal Code Section 490.5 is much easier to construct: if

6    Plaintiff prevails on this claim the Court could enjoin Defendants from demanding more than the

7    Penal Code permits if that is the only claim pursuant to which Defendants are making a demand.

8    But again, to be entitled to injunctive relief Plaintiff must prove that the unfair competition—the

9    demand for more money than what Plaintiff believes was statutorily unfair—caused Plaintiff to

10   lose money.  Again, it is highly unlikely that Plaintiff can meet this burden given that he did not

11   pay Palmer any money in response to the settlement demand.  And as the Court noted in its Order

12   denying class certification, "a fact finder could easily conclude that Plaintiff's $100 attorney fee

13   had nothing to do with the request to pay more than Section 490.5 permits." *Lee*, 2015 WL

14   9480475, at *16.  But again, Defendants did not move for summary judgment on this ground.

15        At bottom, Plaintiff has not cited a single case in which a plaintiff brought individual

16   claims under the UCL, presented no possibility of future harm to himself, but nevertheless was

17   awarded injunctive relief.  The burden on summary judgment, however, is on Defendants.

18   Defendants made a two-sentence argument that Plaintiff is not entitled to injunctive relief under

19   any circumstances relying exclusively on the Court's class certification Order.  On this record the

20   Court is not comfortable throwing out the UCL claim on this remedy ground; instead, it will

21   proceed to trial to decide whether Plaintiff can even prove a UCL violation, including proving that

22   he lost money because of the violation in the first instance.

              iii.    Reconsideration

23

24        Plaintiff's supplemental brief asks this Court to reconsider the decision denying class

25   certification of the UCL claim for injunctive relief.  (Dkt. No. 190 at 2 ("Plaintiff respectfully

26   submits that this Court should reconsider its Order denying class certification").)  This request is

27   improper.  As Plaintiff himself states in the very same letter brief on the very same page (albeit

28   referring to Defendants), to seek reconsideration a party must comply with Local Rule 7-9.  (*Id.*)

1    Plaintiff does not explain why Local Rule 7-9 applies to Defendants but not to Plaintiff.  Of

2    course, it applies to both.  Plaintiff's request is knowingly procedurally improper, which is reason

3    enough to deny it.

4         But there is more: Plaintiff's request also misconstrues the Court's class certification

5    ruling.  The Court denied Plaintiff's motion for Rule 23(b)(2) certification of a UCL injunctive

6    relief class because his claims, including the injunctive relief claim, are not typical of the class as

7    he did not pay any money to Defendants in response to their letter.  *Lee*, 2015 WL 9480475, at

8    *15.  As explained above, Defendants have a defense to Plaintiff's claim that may not apply to

9    other class members; namely, that he did not lose any money or property as a result of the

10   challenged unfair practice.  He thus did not satisfy his burden of showing typicality.  Plaintiff's

11   suggestion of reconsideration also ignores that the Court also found him an inadequate class

12   representative.  *Id.* at *8-11, 16.

13                                        *   *   *

14        Defendants have established that on the UCL claims remaining in this case Plaintiff does

15   not have any claim for restitution.  Accordingly, the Court will grant summary judgment in

16   Defendants' favor on the UCL claim seeking restitution.  Although the Court has grave doubts as

17   to Plaintiff's ability to prove an entitlement to any injunctive relief, the Court denies Defendants'

18   motion for summary judgment on the injunctive relief claim at this time.

19              b.    *Plaintiff's Motion: Whether There is Unfair or Unlawful Business Conduct*

20        Even assuming injunctive relief is a possibility, Plaintiff is not entitled to partial summary

21   judgment on his UCL claim because he has failed to establish that Defendants' conduct actually

22   violates the UCL.  To the contrary, genuine disputes of fact remain.

23                    i.    Underlying FDCPA Violation

24        Plaintiff argues that it is undisputed that Defendants violated the UCL's "unlawful" prong

25   based on a predicate violation of the FDCPA.  However, because there is a genuine dispute about

26   whether there was an FDCPA violation, so too is there a genuine dispute about whether

27   Defendants engaged in unlawful business activity by violating the FDCPA.  The Court therefore

28   denies Plaintiff's motion for partial summary judgment on this question of law.

United States District Court
Northern District of California

United States District Court
Northern District of California

ii.      Underlying Penal Code Violation

Plaintiff next contends that partial summary judgment should be granted in his favor on the UCL claim based on Defendants' violation of Penal Code Section 490.5.  He seems to suggest that Defendants should be held liable under the unlawful prong based on an underlying violation of Penal Code Section 490.5.  (*See* Dkt. No. 181 at 26 (citing cases holding that Penal Code violations can serve as the predicate for an unlawful UCL claim).)  The Court has already granted judgment in Defendants' favor on this claim.  In its Order granting in part Defendants' motion for judgment on the pleadings, the Court explained that "[n]othing in Section 490.5 makes it a violation of the law to demand more than the $500 afforded in the law.  In other words, while Defendants are not entitled to such an amount, the demand itself is not unlawful."  (Dkt. No. 77 at 8.)  It is troubling that Plaintiff attempts to renew this argument without acknowledging the Court's earlier ruling.

Even if this UCL claim were still in the case, the Court would not grant Plaintiff's request for summary judgment.  And indeed, as he did in the context of the motion for judgment on the pleadings, Plaintiff relies on *Irwin v. Mascott*, in which a court in this district granted the plaintiff declaratory relief finding that the defendant "acted unlawfully in seeking damages pursuant to California Penal Code § 490.5[.]"  112 F. Supp. 2d at 956.  *Irwin* is of no more help now than it was at the motion for judgment on the pleadings stage.  *Irwin* was not about seeking more penalties that the criminal code provides.  Moreover, the *Irwin* court stated in a single sentence that the "the deceptive practices described above which violate the FDCPA, also violate the [UCL]."  *Id.* at 955.  *Irwin* thus did not hold that seeking more than allowed under a statute imposing money damages is, by itself, unlawful.

The other case that Plaintiff cites, *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553, 570-72 (1998), *superseded by statute on other grounds as stated in Arias v. Super. Ct.*, 46 Cal.4th 969 (2009), is equally unpersuasive.  The plaintiff brought a UCL claim against the defendant for selling cigarettes to minor children in violation of Penal Code Section 308.  *Stop Youth Addiction*, 17 Cal.4th at 558.  In other words, the defendant could have been subject to criminal liability if the state had prosecuted, but instead the court held that a private plaintiff could

1    bring suit under the UCL's unlawful prong despite the absence of an express private right of

2    action in the Penal Code. *Id.* at 570-72. Unlike *Stop Youth Addiction*, however, there is no

3    evidence here that Defendants violated Penal Code Section 490.5 in such a manner as to generate

4    potential criminal liability. Nothing in Section 490.5 makes it a violation of the law to demand

5    more than the $500 penalty amount afforded in the law. Accordingly, the Court declines to grant

6    Plaintiff summary judgment on his UCL claim based on a predicate violation of Penal Code

7    Section 490.5, since no such predicate violation exists.

8                    iii.    *Unfair Business Activity*

9           Aside from alleging that Defendants' conduct was "unlawful," Plaintiff also argues that he

10   is entitled to summary judgment under the UCL's "unfair" prong. Under the unfairness prong of

11   the UCL, "a practice may be deemed unfair even if not specifically proscribed by some other law."

12   *Korea Supply Co.*, 29 Cal.4th at 1143 (internal quotation marks and citation omitted). "The term

13   'unfair' as it is used in the UCL context has been defined in numerous ways, none of which has

14   yet been adopted as controlling by the California Supreme Court or the Ninth Circuit[.]" *Pirozzi*

15   *v. Apple, Inc.*, 966 F. Supp. 2d 909, 921 (N.D. Cal. 2013); *see also Bias v. Wells Fargo & Co.*, 942

16   F. Supp. 2d 915, 933 (N.D. Cal. 2013) ("The California Supreme Court has not established a

17   definitive test to determine whether a business practice is 'unfair' in consumer cases.") (citations

18   omitted). California courts have defined an "unfair" business practice as:

19                   (1) a practice that offends established public policy, or is immoral,
                     unethical, oppressive, unscrupulous or substantially injurious to
20                   consumers; (2) a practice the utility of which is outweighed by the
                     gravity of harm to the victim; and . . . a practice that is (i)
21                   substantially injurious to the consumer, where (ii) the injury is not
                     outweighed by countervailing benefits to consumers or competition,
22                   and (iii) the injury is not one that consumers themselves could
                     reasonably have avoided.
23

24   *Id.* at 921-22 (citations omitted).

25          Plaintiff seeks summary judgment on the unfair UCL claim on several different grounds.

26   Applying the first test, he contends that there is "no utility to Defendants' practices" because even

27   though Plaintiff "paid $20 to resolve all of his debts to Pep Boys[,]" Defendants still sent him

28   letters that "served no purpose other than to harass and intimidate [him]" (Dkt. No. 181 at 25), and

United States District Court
Northern District of California

1    that the letter is unfair because it implicates the public policy behind the FDCPA.  (*See* Dkt. No.

2    186 at 17.)  Relatedly, applying the second, which "involves an examination of that practice's

3    impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged

4    wrongdoer[,]" *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 836

5    (9th Cir. 2008), he argues that Defendants' conduct is unfair because the letters harassed and

6    intimidated him without having any utility.  (*See* Dkt. No. 186 at 17.)

7           Plaintiff waived any such arguments and cannot bring them now.  As mentioned above,

8    during a court-ordered telephone call, Plaintiff explained that his standalone UCL claim is based

9    on the allegations in SAC Paragraph 34(a) and (b), which allege violations based on Defendants

10   "seeking charges from alleged debtors in excess of those expressly permitted by [Penal Code

11   Section] 490.5" and "accusing alleged debtors [of] violating [Section] 490.5 without determining

12   whether [that statute] applied to the debtors.  In other words, whether the debtors have been

13   convicted of the actual alleged theft."  (Dkt. No. 70-1 at 7:18-23, 25; *id.* at 8:1-4; *id.* at 13:6-9

14   (confirming that the only standalone claims Plaintiff brings under the UCL are in Paragraph 34(a)

15   and (b) for "seeking more than the amount allowed under 490.5, and then seeking these claims

16   against people who have not been convicted of any crimes."); *see also* Dkt. No. 73 at 22-24; Dkt.

17   No. 25 ¶ 34; Dkt. No. 77 at 4:6-9.)  Plaintiff is limited to these identified bases of unfairness and

18   thus cannot prevail on his "utility" and public policy arguments.[8]

19           The Court granted Defendants' motion for judgment on the pleadings as to Plaintiff's

20   UCL claim under the "unfair" prong to the extent Plaintiff alleges that Section 490.5 requires a

21   criminal charge or conviction as a prerequisite to sending a demand letter.  (Dkt. No. 77 at 9.)

22

---

23   [8] In any event, these arguments would fail.  The two utility arguments are premised on the notion

24   that Plaintiff's $20 payment to Pep Boys resolved all of the company's claims against him, so
     there was no purpose to the collection letters and thus they served only to harass and intimidate

25   him.  As explained above in the context of Plaintiff's FDCPA claim, Plaintiff has not
     demonstrated that the $20 payment to Pep Boys resolved all of the company's claims against him.

26   *See supra* Section A.2.a.iii.  As for the public policy argument, Plaintiff maintains without further
     explanation or argument that the letter is unfair because it implicates the public policy behind the

27   FDCPA.  (*See* Dkt. No. 186 at 17 ("Plaintiff has shown that there is a significant public policy in
     Congress' enactment of the FDCPA.") (citation omitted).)  While such public policy exists,

28   merely referencing the public policy behind the statute does not establish unfair business practices
     as a matter of law.

1    Thus, the only grounds for unfairness that remains in this lawsuit is Plaintiff's argument that

2    Defendants' demand-letter conduct is unfair because it seeks civil penalties pursuant to Penal

3    Code Section 490.5 but makes a demand for payment in excess of the statutory ceiling—in other

4    words, because the letters demanded more than the statute allows.

5    But even if this were unfair, Plaintiff has offered no evidence from which a reasonable fact

6    finder could conclude that Plaintiff's alleged harm (paying $20 to Pep Boys and $100 to his

7    attorneys) resulted from the unfairness alleged here—that is, the practice of seeking more than

8    Penal Code Section 490.5 permits.  To the contrary, neither Plaintiff's own response to Palmer's

9    letters nor his attorney's letter even mentioned that the letters were unfair because Palmer sought

10   penalties in excess of the statutory maximum.  *See Lee*, 2015 WL 9480475, at *16.  Further, the

11   $20 payment to Pep Boys occurred long before Plaintiff ever received Palmer's letters, so that

12   payment cannot have resulted from the alleged unfair demand.  As for the $100 payment to his

13   attorney, it is not clear whether Plaintiff retained counsel before or after he received the second

14   letter—the only one that sought more than Section 490.5 permits.  For each of these reasons, the

15   Court cannot conclude as a matter of law that Defendants' practice of seeking more in penalties

16   than Penal Code Section 490.5 permits harmed Plaintiff in a manner that makes the conduct an

17   unfair business practice.

18                                          *  *  *

19   Accordingly, even if Plaintiff were entitled to restitution or injunctive relief, the Court still

20   would not grant partial summary judgment in Plaintiff's favor on the UCL claim because Plaintiff

21   has not proven that Defendants' conduct was either unlawful or unfair as a matter of law.

22                                      **CONCLUSION**

23   For the reasons described above, the Court GRANTS IN PART Defendants' motion for

24   summary judgment and GRANTS IN PART Plaintiff's motion for partial summary judgment.

25   Specifically, as for the FDCPA claim, Defendants are entitled to partial summary judgment that

26   the oil change and Ms. Bacca transaction did not create FDCPA debts.  But there remains a

27   genuine dispute over whether Defendants sought to collect on an FDCPA debt based on Plaintiff's

28   use of the employee discount for his mother.  Plaintiff is entitled to partial summary judgment

United States District Court
Northern District of California

29

that, *if* the FDCPA were to apply, then the language of the letters would violate the first three FDCPA subdivisions alleged, but the Court denies summary judgment on whether the letters violate Section 1692f(1) by demanding attorneys' fees.

As for the UCL claim, Defendants are entitled to summary judgment on Plaintiff's UCL claim for restitution.  However, the Court declines to grant summary judgment on the claim for injunctive relief.  To be clear, the only UCL claims that remain in this lawsuit are (1) an "unlawful" claim predicated on an underlying FDCPA violation, but not an underlying violation of Penal Code Section 490.5; and (2) an "unfair" claim based on Defendants' practice of seeking more in penalties than Penal Code Section 490.5 permits.  Factual disputes preclude partial summary judgment in Plaintiff's favor on these claims.

The Court will hold a further case management conference on June 16, 2016 at 1:30 p.m. The parties shall submit an updated case management conference statement one week in advance that focuses on the structure of trial.

This Order disposes of Docket Numbers 180 and 181.

**IT IS SO ORDERED.**

Dated: May 16, 2016

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

30